Raymond CROTEAU and Henry Fortier

v.

OLIN CORPORATION.

No. 82–87, 88–L.

United States District Court, D. New Hampshire.

Sept. 16, 1986.

Arnold P. Hanson, Bergeron & Hanson, Berlin, N.H., Kenneth C. and Stanley M. Brown, Manchester, N.H., for Croteau and Fortier.

Howard Meyers, Myers & Laufer, Concord, N.H., for Olin Corp.

## MEMORANDUM ORDER

LOUGHLIN, District Judge.

On November 2, 1977 three young men went on a hunting trip which had a tragic ending.

The preceding evening they had slept in a camper and early on the morning of November 2, 1977 they ate breakfast and made preparations to hunt. They checked and loaded their weapons.

Henry Fortier, Paul Croteau and Raymond Croteau were in the area of Kilkenny Route in northern New Hampshire approximately 13 miles in a desolate area, without dwellings.

The road being traversed was about 18 feet wide. The three hunted in the morning, spread out apparently parallel to the service road.

Around 10 or 10:30 a.m. the nimrods, not having any success, met on the service road and discussed returning to the camper some distance down the road in order to have lunch. They estimated that they were within 20 to 30 minutes walking distance from the camper.

In the rear was Paul Croteau. To his immediate front and approximately seven feet in front of him was Raymond Croteau. Raymond Croteau was to Paul Croteau's right. Immediately in front of Raymond Croteau about another seven feet in distance was Henry Fortier. Fortier was also to the right of Paul Croteau and approximately fourteen feet from him.

Paul Croteau is left-handed, then weighed about 185 pounds and was carrying a Winchester 94—"66 Centennial" rifle. He stumbled, fell, his left arm releasing the Winchester. Falling forward approximately five feet, his right hand clutching the gun, he struck the road which was hard. The weapon discharged. The bullet was propelled forward on a horizontal level. The bullet entered Raymond Croteau's left foot about an inch or two from the bottom of the foot.

The bullet exited and at about the same trajectory entered the right foot of Henry Fortier finally coming to rest at his fourth metatarsal head.

Henry Fortier heard Raymond Croteau scream. He then realized that he had also been shot.

Raymond Croteau was bleeding profusely. Paul Croteau, the only one of the trio who was uninjured ran down the road to get help. After running awhile he was able to get the attention of a man with a pickup truck. They drove back to the accident scene, and loaded Raymond and Henry in the rear of the pickup truck. They first went to a fish hatchery, applied a pressure bandage to Raymond's foot and then drove to the Androscoggin Hospital in Berlin, New Hampshire.

### Liability

Plaintiffs have brought an action in strict liability and negligence. The rifle

involved is a Winchester Lever Action Model 94, 30 caliber rifle manufactured and sold by defendant in 1966. It was purchased by Paul Croteau's brother, Maurice Croteau on August 1, 1977. It was in good condition on the date of the accident.

Robert Vashaw, a hunting safety instructor had instructed Paul Croteau about the safe manner of handling the weapon. Vashaw's instructions were to carry the rifle with the finger level slightly open so brass could be seen and on half cock. Both plaintiffs had also taken Vashaw's safety course.

The weapon must be operated by hand to either load or unload it. There is a loading port on the right side of the rifle.

After ejecting a cartridge, the lever action must be fully closed and locked before starting the next cycle.

At the time of the incident, Paul Croteau carried the weapon with a live cartridge in the chamber. The hammer was in half cock, finger lever opened an inch or an inch and a half.

The locking bolt disengaged and the safety catch on the trigger was engaged.

The court finds that as Paul Croteau struck the ground, the rifle fired. The firing of the weapon was caused by "inertia firing". The forward motion of the rifle immediately stopped as it hit the ground.

This caused inertia firing by the firing pin. The cartridge casing ruptured. The ruptured cartridge casing evidenced the fact that neither the trigger or the hammer were involved in the firing. The weapon was not locked when the cartridge was fired. The lever was partly open, the locking bolt down which prevented the hammer from impacting the firing pin. The safety catch on the trigger was engaged as the finger lever was not squeezed against the lower tang.

The firing pin was too heavy; it carried forward by its own inertia causing the weapon to fire. A lighter firing pin which was later used would have obviated this problem. This was known, or should have been known or foreseeable by the defendant prior to the accident. Winchester was aware of the hazard of "inertia firing" many years prior to the accident of November 2, 1977.

In its advertisements it was stated "all guns with plain trigger are provided with an attachment which renders premature explosion of the cartridge, even from carelessness, absolutely impossible." The aforesaid are excerpts from a Winchester 1882 catalogue. On or about August 25, 1976 in changing component nomenclature, safety catch was deleted. "Trigger Stop" was "Safety Catch."

The defendant, in the 1950's modified the half cock position of the Model 94 which was known to be hazardous. Defendant never notified owners and users of Model 94's not equipped with the Romer modification to submit the weapons for retro-fit or recall.

Defendant did not during the period it operated the Winchester Repeating Arms Company warn its purchasers that its large free floating firing pin constituted a hazard.

The defendant was aware of the hazards and knew, or should have known, that the Model 94 Winchester rifle, and from experience the "Centennial 66" version of the 94, is unreasonably dangerous. It is also true that the Winchester rifle is the most popular one used for deer hunting.

The defendant also had knowledge prior to the accident of the problem of "inertia firing" and that this accident was foreseeable. This was also denied by the defendant in response to interrogatories filed by the plaintiff.

It was stated that it never had a Consumer or Product Safety Committee. Without question, there was such a committee which was extant at sometime during the middle 1970's. Further, the committee was aware of the danger of someone falling on his weapon as Paul Croteau did.

On November 4, 1976, J.P. Jarvis, Director of Engineering for the defendant at that time gave cost figures for adding an additional safety to the M/94. The defendant was also aware, due to a reference to "Do you Really Know Guns?" by Walter J.

Howe of the problem of "inertia firing". This has also been referred to as "slam firing".

Another representative of the defendant, Mr. Van Wilgen was aware of an accidental firing in 1976 in which a person was killed. Van Wilgen conducted slam firing by slamming the lever closed to investigate that accident.

The accidental firing by firing pin inertia when the action was closed when the gun struck the ground proximately caused the weapon to fire. *Corso v. Merrill*, 119 N.H. 647, 466 A.2d 300. *Bosse v. Litton Unit Handling Systems, Inc.*, 646 F.2d 689 (1st Cir.1981). As this is a diversity case, the law of New Hampshire applies. *Premium Management, Inc. v. Walker, et al.*, 648 F.2d 778 (1st Cir.1981).

The court finds that both plaintiffs should recover on the action in strict liability. *Thibault v. Sears, Roebuck Co.*, 118 N.H. 802, 395 A.2d 843 (1978).

There was a defect in the Model 94 Centennial "66" rifle used by Paul Croteau on November 2, 1977 which made the weapon unreasonably dangerous to the plaintiffs. The defect existed at the time it left the defendant's control and there was not any substantial change in the gun at the time of the accident.

In a strict liability case alleging defective design, the plaintiff must first prove the existence of a "defective condition unreasonably dangerous to the user." *Buttrick v. Lessard*, 110 N.H. at 38–39 [260 A.2d 111].

*Thibault*, at 897, 395 A.2d 843.

The plaintiff in a defective design case must also prove causation and foreseeability. He must show that the unreasonably dangerous condition existed when the product was purchased, *McLaughlin v. Sears, Roebuck & Co.*, 111 N.H. at 267, 281 A.2d at 588, and that the dangerous condition caused the injury. W. Prosser, The Law of Torts § 41 (4th ed. 1971). The plaintiff must further prove that the purpose and manner of his use of the product was foreseeable by the manufacturer. This requirement is predicated on the manufac-

turer's duty to design his product reasonably safely for the uses which he can foresee. Foreseeability of use, however, extends beyond the consumer's actual use of the product.... A manufacturer "is not obliged to design the safest possible product, or one as safe as others make or a safer product than the only one he has designed, so long as the design he has adopted is reasonably safe." *Mitchell v. Ford Motor Co.*, 533 F.2d 19, 20 (1st Cir.1976).

*Thibault*, at 809, 395 A.2d 843.

Strict liability is not a no-fault system of compensation. *Thibault* at 806, 395 A.2d 843.

■ Product misuse was not a superseding cause of the accident. In the usual case, no reason of the law stands to prevent a defendant in a products liability action from arguing a third person's negligence or misuse of the product as the sole proximate cause of the plaintiff's injury. *Reid v. Spadone Machinery Co.*, 119 N.H. 457, 465, 404 A.2d 1094 (1979). See also *Murray v. Bullard Co.*, 110 N.H. 220, 223, 265 A.2d 309 (1970).

A manufacturer is not an insurer of his product. The New Hampshire Supreme Court in *Thibault*, at 807, 395 A.2d 893, stated we recognize some limits to the doctrine of strict liability. See *Bolduc v. Herbert Schneider Corp.*, 117 N.H. 566, 374 A.2d 1187 (1977).

■ The burden of proof is on the defendant to prove plaintiff's misconduct. Strict liability is a judicially created doctrine to which the principle of comparative causation will be applied. *Thibault*, at 810. It is called plaintiff's misconduct. This case involves counts in strict liability and negligence. This is an affirmative defense i.e. misconduct of the plaintiff, *Thibault*, at 813, 395 A.2d 893. Regardless of the nuances of the *Thibault* opinion on plaintiffs' misconduct, the defendant has failed to prove that either Henry Fortier or Raymond Croteau's actions were plaintiffs' misconduct.

The court also rules that the firing pin was the proximate cause of the plaintiffs' injuries and this negligence caused the inju-

ries to the plaintiff and the resultant damages, *Corso v. Merrill,* 119 N.H. 647, 406 A.2d 300; further, that there was a failure to warn of the dangerous propensities of the weapon.

### Damages

Relative to damages, in order to eschew confusion, the court will initially refer to the damages of Henry Fortier. He has a life expectancy of 47.2 years. *Walker v. Walker,* 106 N.H. 282, 288, 210 A.2d 468 (1965).

Henry had a bullet fragment removed by Dr. Paul Smith on the date of the accident. In all he had four operations which also included skin grafting. He was in a cast for two weeks and then on crutches for a period of time. Due to recurrent pain, he was readmitted to the hospital, more lead was removed, debridement and skin grafts were performed. There were fractures of his third metatarsal and there were and probably still are foreign bodies in the mid-metatarsal region of his foot.

Approximately a year later a bullet fragment was surgically removed and a skin graft applied to cover the wound.

The wound was abscessed around the foreign body and was drained. As a result of his wound, Henry has a slight limp. He also has increased sensitivity in the foot, flexing problems and nerve damage. The left foot was severely injured. The court viewed Henry's foot and even to the lay person it is apparent that it is badly scarred.

Henry is now working at Bass Shoe, but during the day he is bothered by pain in his foot. His disability limits his activities in participating in winter sports. The foot is also bothered by cold weather. He has to be extra careful not to irritate or bruise the foot because of its propensity to ulcerate or get infected.

His hospital, medical and doctor bills total $7,708.61. The court finds that on the medical evidence presented that Henry has a ten percent (10%) permanent partial disability of his foot.

With regard to Raymond Croteau, as heretofore stated the bullet entered one side of his foot and exited or came out of the medial side of the same foot and then struck Henry Fortier. The wound was so large that as Dr. Smith testified he was able to put a clinched fist through one side and out the other side after he cleansed the wound.

Raymond was hospitalized for three weeks and had many operations including skin grafting as he had two open wounds on his foot. He was rehospitalized for different periods in 1978 for infections, ulcers and skin grafts and for another period in December, 1977.

He joined the Navy and was hospitalized because of exacerbation of the foot wound and eventually received a medical discharge.

Eventually, a portion of his 5th metatarsal area of his foot was removed by Dr. H. Taylor Caswell, Jr.

Dr. Paul Smith on November 2, 1977 attended and operated on both Raymond and Henry. He was their attending physician for sometime thereafter.

In 1978, Raymond had frequent treatments for ulcerations of his foot. At the time of the accident he was in his first year of high school and for the next two years he was limited in participation in sports and school functions.

Raymond is presently residing in Littleton, New Hampshire and he is employed as a machinist. His employment entails a great deal of standing. His employer is solicitous and he is allowed to rest his foot. He does have problems when he works because of weight bearing disabilities with his injured foot.

He is chronically bothered with blisters and resultant infections. Doctor Kenneth Danielson took care of Raymond by debriding the tissue which became ulcerous. He developed hammer-toe deformities in the fourth and third metatarsal.

Raymond Croteau has a life expectancy of 48.1 years.

Medical bills totaled $14,313.95. Lost wages amounted to $1,716.24. The total is $16,030.19.

Raymond is also severely restricted as far as recreational activities are concerned. His foot is very sensitive to pain and the risk of infection. There are still parts of bullet fragments in the foot. Doctor Caswell, in testifying, did describe Raymond's foot as that of a seventy-two year old individual. Dr. Caswell is an orthopedic surgeon.

The court finds that Raymond Croteau has suffered a forty percent (40%) permanent partial disability of the lower left extremity.

A plaintiff is entitled to fair compensation by a verdict which is not niggardly. *Jolicoeur v. Conrad,* 106 N.H. 496, 500 (1965).

.    .    .    .    .

In a case of tort ... the general purpose of compensation is to give a sum of money to the person wronged which as nearly as possible, will restore him to the position he would be in if the wrong had not been committed.

*Emery v. Caledonia Sand-Gravel Co. Inc.,* 117 N.H. 441, 447, 374 A.2d 929 (1977).

"Pain and suffering is a very material element of damages in tort cases." *Duguay v. Gelinas,* 104 N.H. 182, 185, 182 A.2d 451 (1962).

"It is more probable than otherwise that both of the plaintiffs will suffer future pain and suffering." *Plume v. Couillard,* 104 N.H. 267, 269, 184 A.2d 452 (1962).

The court does not find that the defendant acted in an intentional, wilful wanton oppressive and malicious manner so as to entitle the plaintiffs to punitive or exemplary damages. *Vratsenes v. N.H. Auto,* 112 N.H. 71, 289 A.2d 66 (1972).

The court finds that in the case of Raymond Croteau that it is more probable than otherwise that he will incur medical bills in the future. *Walker v. Walker,* 106 N.H. 282, 210 A.2d 468 (1965).

Plaintiff has filed 78 requests for findings of fact and rulings of law; defendant 220 or a total of 308. Many requests, especially those of fact include three or more separate findings in one request.

*Concord General Mutual Ins. Co. v. Haynes,* 110 N.H. 76, 79, 260 A.2d 99 (1969).

Rule 52, Fed.R.Civ.P.

Findings should represent the judge's own determination and not the long, often argumentative statement of successful counsel.

.    .    .    .    .

The judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.

*United States v. Forness,* C.C.A.2, 1942, 125 F.2d 928, certiorari denied 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764.

Judgment for the plaintiff Fortier in the sum of $175,000.

Judgment for the plaintiff Croteau in the sum of $385,000.